Filed 11/4/21  P. v. Delgado CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIA LUISA DELGADO,<br><br>    Defendant and Appellant. | H047799, H048217<br>(Monterey County<br> Super. Ct. No. 19CR004405) |

Appellant Maria Luisa Delgado was convicted of first degree burglary for entering an apartment with the intent to intimidate a witness or to commit the crime of criminal threats, and the jury found that she committed the burglary while another person was inside the apartment.  The jury also convicted Delgado of dissuading a victim by force or threat and two counts of criminal threats.  The trial court sentenced Delgado to a prison term of two years.

On appeal, Delgado contends the " 'person present' " violent felony allegation attached to the burglary must be stricken because it doubly punishes her for the same conduct as the burglary.  Alternatively, Delgado argues the trial court abused its discretion by refusing to strike the violent felony allegation under Penal Code section

1385.[1]  In addition, Delgado asserts there is insufficient evidence for her dissuasion conviction and, alternatively, the concurrent sentence imposed for her criminal threat conviction involving the same victim must be stayed under section 654.

For the reasons explained below, we affirm the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND

A. *Procedural Background*

In December 2019, the Monterey County District Attorney filed an amended information (hereafter information), which was further amended orally at trial, charging Delgado with first degree burglary of an inhabited dwelling occupied by Brenda C. (§ 459; count 1), dissuading a witness from reporting victimization of Rafael C. by force or threat (§ 136.1, subd. (c)(1); count 2), and two counts of criminal threats against Rafael C. and Brenda C., respectively (§ 422, subd. (a); counts 3 & 4).[2]  The information further alleged that the burglary charged in count 1 is a violent felony within the meaning of section 667.5, subdivision (c), in that another person other than an accomplice was present in the residence during the commission of the burglary (hereafter violent felony allegation).  That same month, a jury convicted Delgado on all counts as charged.

In January 2020, the trial court sentenced Delgado to a lower term of two years in prison for the burglary conviction (count 1) with concurrent lower terms of two years for the dissuasion conviction (count 2) and one year four months for each of the criminal threats convictions (counts 3 & 4).  The trial court did not stay the punishment on any counts pursuant to section 654.  In addition, the court calculated the award of "conduct work credits" at 15 percent, based on the violent felony allegation in count 1.[3]

---

[1] Unspecified statutory references are to the Penal Code.
[2] To protect the privacy of the two victims, we refer to them by their first names and the first initial of their last name.  (Cal. Rules of Court, rule 8.90(b)(4).)
[3] In this opinion we refer, collectively, to presentence "conduct credit" (which includes worktime credit and good behavior credit) and postsentence "worktime credit" as "conduct credit."  (See *In re Pope* (2010) 50 Cal.4th 777, 781–782 (*Pope*); *People v. Dieck* (2009) 46 Cal.4th 934, 939, fn. 3.)

Delgado timely appealed the judgment of conviction. This court assigned the appeal case No. H047799.

In April 2020, under section 1170, subdivision (d)(1), Delgado requested that the trial court: (1) recall her sentence because of a sentencing error under section 654; and (2) pursuant to section 1385, strike the violent felony allegation, which, in combination with section 2933.1, limits her conduct credits to 15 percent.

The district attorney opposed Delgado's request to strike the violent felony allegation, and argued that the concurrent sentences imposed on counts 2 and 3 did not violate section 654. The district attorney agreed that the sentence on count 4 should be stayed under section 654.

In May 2020, the trial court recalled Delgado's sentence.

In June 2020, the trial court held a resentencing hearing. The court declined to strike the violent felony allegation. The court resentenced Delgado to the same prison term previously imposed but modified the sentence pursuant to section 654 by staying the concurrent term imposed for the conviction on count 4 (criminal threats against Brenda C.). The court did not stay under section 654 the sentences imposed on count 2 (the dissuasion count involving Rafael C.) and count 3 (criminal threats against Rafael C.). The court again calculated Delgado's conduct credits at 15 percent.

Delgado timely appealed from her resentencing. This court assigned the appeal case No. H048217.

This court subsequently ordered that Delgado's two appeals be considered together.

B. *Evidence Presented at Trial*

      1. Prosecution Evidence

In January 2019, Rafael C. worked as an on-site maintenance supervisor at an apartment complex in Salinas.[4] He lived in a ground-floor apartment with his wife, Brenda C., and their children and spoke English and Spanish.

Around 5:30 p.m. on January 26, Rafael C. and Brenda C. were home preparing dinner and bathing their children. Six children were in the apartment, including two-year-old triplets. Rafael C. heard laughter and yelling coming from the complex's swimming pool, which was about 50 feet from his apartment. He looked out through a sliding door and saw people inside the pool area. The pool, however, was closed for the winter. A gate to the pool area was locked, and a closure notice had been posted and distributed to the residents.

Rafael C. told Brenda C. that he was going to tell the people to get out of the pool. Rafael C. went outside and told a man that he and the teenagers with him had to leave the pool because it was closed for the season. The man protested and questioned Rafael C.'s authority. Rafael C. explained that he was responsible for the complex. The man replied, " 'I'm going to fuck you up.' " Rafael C. felt threatened and told the man he was going to call the police. After phoning the apartment complex manager, Miguel Diaz, Rafael C. called 911 and reported that there were people in the closed pool. The group then left the pool.

While Rafael C. was speaking to the 911 dispatcher near the patio of his apartment, some of the teenagers returned with appellant Delgado. Delgado told Rafael C. that she lived at the apartment complex and asked why he had ordered the teenagers out of the pool. Rafael C. told Delgado he was talking to the police. Delgado said to Rafael C., in Spanish, " 'Oh, well, we're Norteños, then. We're going to fuck you.' "

---

[4] Unless otherwise indicated, all dates were in 2019.

Delgado also said she was going to kill Rafael C.'s entire family and asked where he lived. Rafael C. feared for his life and his family because he knew the Norteño street gang was very dangerous and Delgado was very upset. Delgado told Rafael C. he should stop calling the police, stating " 'If you mess up, I'm going to fuck you up.' "

The 911 recording captured Delgado saying, "You don't fuckin' know us. Call the fuckin' cops. They ain't gonna do shit for you." Delgado also said, "I live here. I pay rent here. [¶] . . . [¶] I been here two years. [¶] . . . [¶] Let the cops come. [¶] . . . [¶] Go ahead and call 'em. [¶] . . . [¶] Shit, I'm gonna be here." Further, Delgado said "find out what the apartment is. [¶] . . . [¶] That's really fucked up. [¶] . . . [¶] . . . Who's your family? Who the fuck is your family?" During the 911 call, Rafael C. told the dispatcher, "the lady, . . . she wanna tell me she wanna kill me," after which Delgado said, "Think[s] he can scare us. He'll fucking scare us," and "Watcha you gonna fucking do?"

When Delgado asked Rafael C. where he lived, he did not respond. From inside the apartment, Brenda C. heard Delgado say, " 'Mother fucker, is that where you live?' " In addition, a neighbor heard, " 'Oh, you live here, mother fucker? I am going to kill you.' " After Delgado noticed that the sliding door to Rafael C.'s and Brenda C.'s apartment was ajar, she opened it further and entered. Rafael C. stayed outside, but he could see and hear Delgado inside the apartment. Delgado said to Brenda C., " 'Tell your husband to stop calling the police because you don't know who I am. I'm a Norteño[], and I'm going to kill you and your family.' " Brenda C. was very worried, scared, and intimidated; she knew about the Norteños gang. Rafael C.'s and Brenda C.'s teenage children had moved the younger children into a bedroom out of fear, but Delgado saw a stroller and said to Brenda C., " 'Oh, so you're a mom. You have kids. Well, I'm going to make sure I kill you and your family.' "

Delgado exited the apartment. She took Rafael C.'s cell phone from his hand while he was still talking to the 911 dispatcher and ran away with it. Rafael C. told

Brenda C. to call 911. Brenda C. reported to the 911 dispatcher that Delgado had entered their apartment, threatened to kill them, and told Brenda C. to stop Rafael C. from calling the police.

While using Rafael C.'s phone, Delgado told the 911 dispatcher that her "kids are allowed to be in the . . . pool before 10:00" and "[t]his is some nonsense." Delgado said she had taken Rafael C.'s phone because he "doesn't need to be doin' this because we already went through some stuff, and this is not . . . This is . . . actually traumatizing my children, him calling the cops. And it's traumatizing me. So, it's gonna cause a big deal." Delgado also said, "I told that bitch, 'Tell your husband to calm down.' " Delgado gave the dispatcher her name and phone number but not her apartment number because she had "so [many] problems going on," had gone to court, and just obtained "full custody" of her children, who had "been through . . . a trauma." Delgado further said she did not understand why Rafael C. called the police because "[t]here's no disturbance here." Delgado suggested Rafael C. "has a problem with" African Americans given that "[w]e have a . . . gentleman that's an African American, and he's Hispanic." When the dispatcher asked Delgado to give the phone back to Rafael C., Delgado responded, "Of course."

Delgado placed Rafael C.'s phone on a table inside his apartment. Delgado also said to Rafael C., " 'Here, talk to the police,' " and "You'll see, we're going to fuck you.' " Rafael C. got back on the phone and reported to the 911 dispatcher that Delgado "came to my house . . . [¶] . . . [¶] . . .challenges everyone, and . . . she say [*sic*] I'm gonna kill everyone. All my family."

The manager of the apartment complex, Diaz, testified that after Rafael C. called him, Diaz went to the complex. Diaz spoke briefly with Delgado there that night and explained that the pool was closed. Delgado was resistant and insubordinate, saying that Diaz "d[id]n't know who [he was] dealing with." Delgado told Diaz that she has

6

"homeboys" from a Norteño gang in Salinas. Diaz "was a bit unnerved" by Delgado's statements.

Fearing they might be shot by gang members, Rafael C., Brenda C., and their children went to a relative's home after the incident with Delgado. They returned to their apartment the next day but moved into another unit in the complex the following day because they were afraid that gang members would attack them at home.

### 2. Defense Evidence

Delgado testified in her own defense. Prior to these events, she had lived at the apartment complex for two years and had three children, who were 11, 13, and 15 years old. Earlier in the day on January 26 (the date of the incident), Delgado's 15-year-old daughter, Deisjah Y., had celebrated her birthday with a party at a park.[5] Delgado drank some wine but was not intoxicated. After the party, Deisjah, her siblings, and her friends went to the pool at the apartment complex while Delgado unloaded her car.

Later, Deisjah told Delgado that a man had kicked the group out of the pool and was talking to the police. This upset Delgado because she had regained custody of her children eight months earlier and did not want to lose custody of them. Delgado went to the pool and asked the man (Rafael C.) why he was calling the police and what her kids had done. The man did not respond to her.

Delgado got "very loud" and "angry" because she "felt that [she] was going to put [her] kids in jeopardy" and she "d[id]n't know what [the man] had already said to the police." Delgado used vulgar language because she was very upset and defending her kids. Delgado denied that she went into Rafael C. and Brenda C.'s apartment. Delgado explained that she spoke calmly when talking to the 911 dispatcher because she "didn't want the police to think anything of [her] because of [her] prior situation" with her children. Delgado testified that she did not recall making any threats involving gang

---

[5] Because Delgado's daughter is a minor, we refer to her initially by her first name and last initial and then by her first name only. (Cal. Rules of Court, rule 8.90(b)(10).)

association to either Rafael C. or Brenda C. and denied saying anything about gang association to Diaz.

On cross-examination, Delgado denied that she ever spoke to Brenda C. and stated that she did not recall saying, " 'I told that bitch tell your husband to calm down.' " Delgado also denied threatening to kill Rafael C. or his children.

Delgado's daughter Deisjah testified that while she, her siblings, and her friends were at the pool, a man yelled at and threatened them, saying "he was going to kick [their] butts and call the police so they could take [the group] to jail." After this, Deisjah went to get Delgado and told her what had happened. Delgado was a "little bit" upset when talking to the man. Deisjah could only remember Delgado saying in an "angry tone," " 'Why are you yelling at my kids?' " Deisjah did not see Delgado go into any apartment; the entire incident happened outside.

On cross-examination, Deisjah acknowledged she had first reported that the man at the pool threatened her and her friends when she talked to a defense investigator shortly before trial.

### 3. Prosecution Rebuttal

Salinas Police Officer Guadalupe Rodriguez testified that she talked with Delgado for about 25 to 30 minutes on January 29 (three days after the incident). During that conversation, Delgado did not mention anything about being concerned the police would take her children away. Delgado also denied she had yelled profanities at Rafael C. or entered his apartment.

## II. DISCUSSION

Delgado raises four claims of error in this appeal. She contends the violent felony allegation attached to the burglary (premised on the presence of Brenda C. and the six children inside the apartment) must be stricken because it doubly punishes her for the

8

same conduct underlying the first degree burglary conviction.[6] In the alternative, Delgado asserts that the trial court abused its discretion by refusing to strike the violent felony allegation under section 1385. Additionally, with respect to her crimes against Rafael C., Delgado contends there is insufficient evidence for her dissuasion conviction on count 2 and, alternatively, the concurrent sentence imposed for her criminal threat conviction on count 3 must be stayed under section 654. We address Delgado's claims in turn.

A. *Violent Felony Allegation and Restriction on Earning Conduct Credit*

1. Additional Background

Count 1 of the information alleged that Delgado entered an inhabited dwelling house that was occupied by Brenda C. with the intent to commit a felony. The information also alleged that the burglary was a violent felony under section 667.5, subdivision (c)(21) (section 667.5(c)(21)), because a person who was not an accomplice was present in the apartment during the offense. At trial, the trial court instructed the jury that the district attorney had to prove "[w]hen [Delgado] entered a building, she intended to commit either the crime of intimidating a witness or the crime of criminal threats." The court did not give the jury any specific instruction on the violent felony allegation itself.[7] The district attorney argued to the jury that Delgado entered the apartment while it was occupied by Brenda C. and the six children, and the jury returned a verdict finding Delgado guilty of "first degree burglary, person present," in violation of sections 459 and 460, subdivision (a).

---

[6] Delgado uses both "allegation" and "enhancement" when stating her claims regarding the " 'person present' " violent felony allegation under section 667.5, subdivision (c)(21), and the resulting limitation on her conduct credits. For simplicity, we principally use "violent felony allegation" to describe either usage by Delgado.

[7] Delgado does not challenge in this appeal the trial court's instructions to the jury on count 1.

At Delgado's initial sentencing hearing, the trial court explained that Delgado was presumptively ineligible for probation under section 462, subdivision (a), and denied probation because of the seriousness of her crimes and the harm suffered by her victims. The court noted that Delgado "actually entered the home of the victims with the express purpose of threatening to kill the victims and their children. The threats were conveyed inside the home within earshot of the children that were inside the residence." The court imposed two years in state prison for Delgado's first degree burglary conviction, with additional concurrent terms for the remaining counts. The court also ruled, in accordance with sections 667.5(c)(21) and 2933.1, that Delgado's conduct credit should be limited to 15 percent.

At her resentencing hearing, Delgado asked the trial court to exercise its discretion to strike the violent felony allegation, which in turn would render the conduct credit limitation of section 2933.1 inapplicable. Delgado argued, inter alia, that "there is an apparent unfairness" in using the facts that make her nonforcible entry into the apartment a first degree burglary to also find that she committed "an occupied burglary under section 667.5(c)(21), which adds further and most serious penal consequences to her conviction."

The trial court, "after considerably weighing the competing factors asserted by the parties" and noting that its decision was not an "easy" one, denied Delgado's request to strike the violent felony allegation. The court explained that "[t]here is no 'apparent unfairness' in using the [burglary's] facts to support the 667.5(c)(21) enhancement." The court further stated it "has certainly been impacted by the concerns raised by defense counsel," but it also "takes into consideration the impact that [Delgado's] actions have had on the victims in this case, their family, their children that were impacted by [] egregious circumstances that really crossed the line here." In resentencing Delgado, the court again denied probation, limited Delgado's conduct credits to 15 percent, and

10

imposed the same prison term as it had previously, except for staying the concurrent term on count 4 (i.e., the criminal threats to Brenda C.) pursuant to section 654.

On appeal, Delgado contends "the violent felony enhancement and credit restriction [under section 2933.1] was improperly charged, found true, and applied against [her] because the Electorate intended the 'person present' violent felony enhancement be applied in 'hot prowl' circumstances," not "to a crime of residential burglary which involves entry with intent to commit a verbal-act crime – here, a criminal threat in violation of section 422 – against an occupant of the residence." Delgado describes a "typical hot prowl burglary" as one that "involves a forcible entry into a dwelling with the intent to commit theft, where the presence of a non-accomplice in the residence aggravates the nature of the crime in terms of the risk of harm."

Delgado maintains that applying section 667.5(c)(21) under the circumstances in her case "would plainly violate rules precluding 'double punishment' . . . by making a single entry, with a single felonious intent, into both a first degree burglary and a 'person present' violent felony burglary."

Delgado asserts that this result is (1) "inconsistent with the principle that the same fact cannot be used twice to increase punishment," (2) "contrary to the parallel authority of section 654," and (3) "contrary to the further principle that a punishing enhancement can only be properly applied when it serves the purpose of narrowing the category of offender." Delgado further claims the "error here is violative of both state law and due process, because the resulting sentence and credits limitation are unauthorized by state law and unsupported by substantial evidence, denying [her] fundamental fairness in sentencing." Regarding the remedy for this alleged error, Delgado requests that we direct the trial court to strike the violent felony allegation and order that Delgado's conduct credits not be restricted pursuant to section 2933.1.

11

## 2. Legal Principles

A person who enters any house or apartment "with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.) A burglary is of the first degree where it is "burglary of an inhabited dwelling house." (§ 460, subd. (a).) " '[I]nhabited' means currently being used for dwelling purposes, whether occupied or not." (§ 459; see also *People v. Rodriguez* (2004) 122 Cal.App.4th 121, 132.)

First degree burglary is a " 'serious felony' " (§ 1192.7, subd. (c)(18)) but not a " 'violent felony,' " except where "it is charged and proved that another person, other than an accomplice, was present in the residence during the commission of the burglary." (§ 667.5(c)(21).) "Subdivision (c)(21) was added to section 667.5 by Proposition 21 (the Gang Violence and Juvenile Crime Prevention Act of 1998), effective March 8, 2000." (*People v. Garcia* (2004) 121 Cal.App.4th 271, 275, fn. 2 (*Garcia*).)

Under section 2933.1, a defendant convicted of a violent felony as defined by section 667.5, subdivision (c), has his or her presentence and postconviction conduct credits restricted to 15 percent—rather than the one-for-one credit a defendant might otherwise be eligible to receive.[8] (Compare § 2933.1 with § 2930 et seq. & § 4019; see also *Pope*, *supra*, 50 Cal.4th at pp. 781–782.) By enacting section 2933.1, "[t]he Legislature wished to protect the public by delaying the release of prisoners convicted of violent offenses." (*In re Reeves* (2005) 35 Cal.4th 765, 771; see also *People v. Baker* (2002) 144 Cal.App.4th 1320, 1327 ["The language of section 2933.1, subdivision (c)

---

[8] Section 2933.1 provides in relevant part: "(a) Notwithstanding any other law, any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit, as defined in Section 2933. [¶] . . . [¶] (c) Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp, following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." (§ 2933.1, subds. (a), (c). )

12

evidences an intent to limit the presentence credits that can be received by 'specified felons.' "].)

Regarding multiple punishment, section 654, subdivision (a), currently provides in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§654, subd. (a).) The purpose underlying section 654 "is to ensure that a defendant's punishment will be commensurate with his culpability." (*People v. Correa* (2012) 54 Cal.4th 331, 341 (*Correa*).) To that end, the statute prohibits courts from imposing multiple punishments for the same act or omission. (See *People v. Corpening* (2016) 2 Cal.5th 307, 311–312 (*Corpening*).)

"The California Supreme Court addressed the application of section 654 to sentence enhancements in *People v. Ahmed* (2011) 53 Cal.4th 156 (*Ahmed*). As [the Third District Court of Appeal] has previously explained, 'The *Ahmed* court concluded that section 654 may apply to sentence enhancements arising from the circumstances of the crime and not imposed based on the status of the offender. [Citation.] As our Supreme Court noted, sometimes separate enhancements apply to different aspects of the same substantive offense. [Citation.] Nonetheless, the high court noted that considerations of whether section 654 requires an enhancement to be stayed will generally be unnecessary because the sentence enhancement statutes themselves will more often indicate whether multiple punishments may be imposed. Thus, "[o]nly if the specific statutes do not provide the answer should the court turn to section 654." ' " (*People v. Buchanan* (2016) 248 Cal.App.4th 603, 615 (*Buchanan*).) In light of *Ahmed*, "[s]ection 654 applies when the aspect of a sentence enhancement punishes the exact criminal conduct for which a defendant has been separately convicted and sentenced." (*Id.* at p. 616; see also *Ahmed*, at pp. 163–164.)

13

"We interpret statutes added or amended by voter initiative . . . in the same manner we interpret those enacted by the Legislature." (*People v. Jessup* (2020) 50 Cal.App.5th 83, 87.) Our " ' " ' "fundamental task" ' " ' " is to ascertain the intent of the Legislature or the electorate to effectuate a law's purpose. (See *ibid*.; *Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190 (*Smith*).) " ' " ' "We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature [or electorate] did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " ' " (*Smith*, at p. 190; see also *People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571.)

When, as here, the facts are undisputed, the application of section 654 is a question of law subject to de novo review. (*Corpening*, *supra*, 2 Cal.5th at p. 312.) Further, "[t]he proper interpretation of a statute is a question of law subject to de novo review. [Citation.] When the trial court applies its factual findings under a statute, we review the factual findings for substantial evidence; but the interpretation and application of the statute to those factual findings is a question of law subject to de novo review." (*People v. Harring* (2021) 69 Cal.App.5th 483, 495.)

> 3. <u>Analysis</u>

> a. Whether Conduct Credit Limitations Are "Punishment"

We begin our analysis of Delgado's claim by examining a threshold dispute between the parties. That is, whether the application of section 2933.1's conduct credit

14

limitation—which follows from Delgado's conviction of a violent felony as defined by section 667.5, subdivision (c)—constitutes "punishment" and therefore potentially falls under section 654 and other prohibitions against double punishment.

Delgado asserts that "a reduction in the ability to earn conduct credits increases punishment." She also states that her arguments are directed at the section 667.5(c)(21) enhancement itself—not just to the conduct credit restriction provision of section 2933.1. In response, the Attorney General maintains that section 2933.1 does not increase punishment but is instead a sentencing allegation that limits some defendants' ability to shorten their sentences through work or good conduct.

We first examine the relevant statutes. Section 667.5 is an enhancement statute that, in part, increases punishments for those convicted of violent felonies who have served a prior prison term for a violent felony. (*Doe v. Saenz* (2006) 140 Cal.App.4th 960, 974 (*Doe*).) However, under the facts here, section 667.5 does not operate on its own to enhance Delgado's sentence because there was no allegation Delgado had served a prior prison term for a violent felony. Rather, the violent felony allegation under section 667.5(c)(21) here serves a definitional purpose. Section 2933.1 relies on the violent felony offense defined by section 667.5(c)(21) to establish the applicability of its 15 percent conduct credit limitation.

Although section 667.5(c)(21) does not independently result in any punishment to Delgado, the California Supreme Court has suggested that the conduct credit limitation in section 2933.1 can be considered punishment. In *People v. Lara* (2012) 54 Cal.4th 896, the defendant argued "that to limit a prisoner's opportunity to earn conduct credits is to increase punishment." (*Id*. at p. 905.) In response, our high court stated, "We need not take issue with the proposition that a person who is released a day early is punished a day less. The very purpose of conduct credits is to foster constructive behavior in prison by

15

reducing punishment." (*Id.* at pp. 905–906.)[9]  Consistent with the approach of the

California Supreme Court in *Lara*, we assume without deciding, for purposes of this

appeal, that section 2933.1 constitutes punishment.  As that assumption triggers the

limitations set out in section 654, we turn to that statute's application in this case.

> b.  Application of Section 654 and Other Alleged Double-Punishment
>
> Prohibitions to Count 1 and Its Enhancement

Section 654 prohibits the imposition of multiple punishments for the same act or

omission.  (See *Corpening*, *supra*, 2 Cal.5th at pp. 311–312.)  Section 654, however, is a

general statute, from which courts presume legislative intent about punishment.  (See

*Ahmed*, *supra*, 53 Cal.4th at p. 163.)  A more specific statute (from which we may infer

legislative intent as that provision) can override the general prohibition against multiple

punishment stated in section 654.  (See *id.* at pp. 159–160.)

Here, section 2933.1 is a specific statute whose text takes it outside the general

terms of section 654.  The conduct credit limitations provided for in subdivisions (a) and

(c) of section 2933.1 are mandatory in that they "shall" apply "[n]otwithstanding any

other law" or "any other provision of law," so long as the defendant has been convicted

of a qualifying violent felony.  (§ 2933.1, subds. (a), (c).)  The "[n]otwithstanding any

other law" language in section 2933.1 "creates an exception to section 654."  (*Pope*,

*supra*, 50 Cal.4th at p. 785; see also *People v. Duff* (2010) 50 Cal.4th 787, 797, 800–801;

*People v. Palacios* (2007) 41 Cal.4th 720, 729 [" '[n]otwithstanding any other provision

of law' " in section 12022.53 (for firearm enhancements)]; *id.* at p. 728 [demonstrates a

legislative intent to "create a sentencing scheme unfettered by section 654"].)  Thus,

based on the plain language of section 2933.1, we conclude that section 654,

---

[9] By contrast, prior to *Lara*, some Courts of Appeal concluded that section 2933.1's conduct credit limitation is not punishment because it does not increase a sentence.  Those courts interpreted section 2933.1 to merely restrict how much a sentence can be reduced by a defendant's conduct while in custody.  (See *Garcia*, *supra*, 121 Cal.App.4th at p. 277; *In re Pacheco* (2007) 155 Cal.App.4th 1439, 1445.)

subdivision (a), does not bar the application of section 2933.1's conduct credit limitation, regardless whether its punishment results from an act or omission that is punished otherwise.

Delgado asserts that this language in section 2933.1 does not undermine her double-punishment argument because she also challenges the propriety of her "*dual convictions*" "of both first degree burglary and the 'person present' enhancement under section 667.5(c)(21)," rather than solely the conduct credit restriction of section 2933.1. We are not persuaded that, even if section 654 applied, it would bar Delgado's punishment for both first degree burglary (§ 460, subd. (a)) and the person present provision of section 667.5(c)(21).

As noted previously regarding sentence enhancements, section 654 "applies when the aspect of a sentence enhancement punishes the exact criminal conduct for which a defendant has been separately convicted and sentenced." (*Buchanan*, *supra*, 248 Cal.App.4th at p. 616.) By contrast, the elements of first degree burglary and the violent felony allegation are satisfied by different aspects of criminal conduct. On its face, section 667.5(c)(21) applies (and elevates a first degree burglary to a violent felony) when "another person . . . was present in the residence during the commission of the burglary." (§ 667.5(c)(21).) The person present aspect of section 667.5(c)(21) is not always present when a burglar commits first degree burglary, and that aspect of the criminal act reasonably warrants additional punishment. (See *Ahmed*, *supra*, 53 Cal.4th at pp. 163–164.) Additionally, as a factual matter in this case, the violent felony aspect of the burglary arises not only from the evidence of Delgado's criminal acts toward Brenda C. It also arises because six children were present in the apartment during the commission of the burglary, further satisfying the violent felony allegation. (See *People v. Munguia* (2016) 7 Cal.App.5th 103, 110, citing *Doe*, *supra*, 140 Cal.App.4th at p. 987.) Because section 654 only "bars multiple punishment for the same *aspect* of a

17

criminal act" (*Ahmed*, at p. 164), we conclude the joint application of section 460, subdivision (a), and section 667.5(c)(21) here does not implicate section 654.

Furthermore, we discern no "latent ambiguity" in section 667.5(c)(21) as applied to a non-theft burglary. Referencing such an ambiguity, Delgado urges us to reject the application of section 667.5(c)(21)—and, in turn, section 2933.1's conduct credit limitation—because doing so on these facts would frustrate the purpose of the enhancement itself or produce absurd results.

We do not agree that the application of section 667.5(c)(21) to a situation like the one in this case produces an unintended absurd consequence. "Unquestionably, occupied burglary is a crime involving a potential for violence, justifying an enhanced sentence under Penal Code section 667.5." (*Doe*, *supra*, 140 Cal.App.4th at p. 972.) The inherent dangerousness that results when an occupant is present during a burglary certainly exists when, as in this case, the burglar enters an inhabited residence intending to commit a felony involving a particular occupant and discovers many other occupants present (particularly the occupant's six children). Applying the plain meaning of section 667.5(c)(21) to a situation like the one here—which is at least as dangerous as a "typical hot prowl burglary" where the intended crime is larceny— rationally gives effect to both the language of the statute and its purpose to designate a burglary committed in the presence of others as more serious than a standard first degree burglary. (See *Smith*, *supra*, 11 Cal.5th at p. 190.)

In summary, the text of section 2933.1 makes clear that the conduct credit limitation applies notwithstanding section 654, so long as the defendant is convicted of a violent felony as defined by section 667.5, subdivision (c). Further, under the circumstances of this case, section 654 does not prohibit a finding on or the application of the violent felony allegation under section 667.5(c)(21) as a matter of double punishment or "latent ambiguity." Therefore, we conclude that section 654 does not prohibit the 15 percent limitation on Delgado's conduct credits under section 2933.1.

18

Additionally, we reject Delgado's argument (based on case law interpreting section 186.22, which criminalizes participation in a criminal street gang) that punishing her twice under the facts here constitutes impermissible " 'bootstrapping.' " Specifically, Delgado relies on *People v. Arroyas* (2002) 96 Cal.App.4th 1439, *People v. Briceno* (2004) 34 Cal.4th 451, and *Lopez v. Superior Court* (2008) 160 Cal.App.4th 824, as support for her no-"bootstrapping" argument. Those cases are inapposite because the statutory provisions at issue there are materially distinguishable from sections 2933.1 and 667.5(c)(21). As we have explained, section 2933.1 evinces an intent to apply notwithstanding any other punishment meted out for the underlying conviction, and section 667.5(c)(21) targets a separate and potentially more dangerous aspect of burglary of an inhabited residence. In contrast, the cases Delgado cites interpret unrelated provisions regarding participation in a criminal street gang, which do not include analogous language and intent. These cases thus supply an inadequate basis to alter our conclusion regarding the application of sections 2933.1 and 667.5(c)(21).

Similarly, we are not persuaded by Delgado's reliance on case law regarding the Eighth Amendment's narrowing principle (see *People v. Estrada* (1995) 11 Cal.4th 568, 575–576) or the due process protection against unconstitutionally vague statutes (see *People v. Johnson* (2016) 62 Cal.4th 600, 635, fn. 4). The Eighth Amendment's narrowing requirement does not apply to a case like Delgado's that does not include a special circumstance murder. (Cf. *Estrada*, at p. 575; *Tuilaepa v. California* (1994) 512 U.S. 967, 971–972; *Harmelin v. Michigan* (1991) 501 U.S. 957, 995.) Furthermore, we discern no vagueness in section 2933.1 or section 667.5(c)(21), either facially or as applied to Delgado. Together, the statutes provide adequate notice to potential offenders about the type of burglary that is considered a violent felony and further that conviction for such an offense will result in a limitation on earning conduct credits. (See §§ 2933.1 & 667.5(c)(21); see also *In re Sheena K.* (2007) 40 Cal.4th 875, 890; *Kolender v. Lawson* (1983) 461 U.S. 352, 357.)

19

For these reasons, we reject Delgado's claim that the violent felony allegation under section 667.5(c)(21) is legally precluded in light of her conviction of first degree burglary, such that the enhancement must be stricken and her conduct credits must be unrestricted.

B. *Trial Court's Refusal to Strike the Violent Felony Allegation Under Section 1385*

In the alternative to her claim that the violent felony allegation and resulting conduct credit limitation are legally precluded, Delgado contends the trial court abused its discretion by refusing to strike the violent felony allegation under section 1385. She asserts that "the present situation is closely analogous" to *People v. Vargas* (2014) 59 Cal.4th 635 (*Vargas*), a decision which concluded that "two prior convictions arising out of a single act against a single victim" cannot constitute two strikes under the Three Strikes law. (*Id.* at p. 637.)

In response, the Attorney General argues that the conduct credit limitation under section 2933.1 is mandatory and, thus, the trial court could not "invoke section 1385 to ignore undisputed facts that require the limitation of conduct credit." Additionally, the Attorney General asserts that, even if the trial court could have "expand[ed] the availability" of conduct credit for Delgado, it did not abuse its discretion by rejecting Delgado's request to strike under section 1385.

As discussed *ante*, in declining to strike the violent felony allegation, the trial court noted the factual circumstances of Delgado's crime and mentioned its "considerabl[e] weighing" of competing factors relevant to Delgado's sentencing, including Delgado's concerns as "a single mother [about] not being in a position where she can care for her children while she's serving time in custody" and "the impact that [Delgado's] actions have had on the victims in this case, their family, their children . . . ."

Section 1385, subdivision (a), provides in part that a court "may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of

justice, order an action to be dismissed." (§ 1385, subd. (a).) Subdivision (b) of section 1385 states further: "(1) If the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice in compliance with subdivision (a). [¶] (2) This subdivision does not authorize the court to strike the additional punishment for any enhancement that cannot be stricken or dismissed pursuant to subdivision (a)." (§ 1385, subd. (b)(1), (2); see also *In re Pacheco* (2007) 155 Cal.App.4th 1439, 1444–1445 [discussing the striking of a section 667.5 enhancement allegation or its additional punishment].)

"The standard for appellate review of a decision to dismiss charges or allegations in the furtherance of justice is whether the trial court abused its discretion in making that decision." (*People v. S.M.* (2017) 9 Cal.App.5th 210, 218.) "This standard is deferential. [Citations.] But it is not empty. Although variously phrased in various decisions [citation], it asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts." (*People v. Williams* (1998) 17 Cal.4th 148, 162 (*Williams*).)

We need not resolve whether the trial court lacked authority under section 1385 to strike the violent felony allegation and thereby relieve Delgado of section 2933.1's conduct credit limitation. Even assuming the trial court here had authority to strike the violent felony allegation, it did not abuse its discretion in declining to do so.

At Delgado's resentencing, the trial court provided, in detail, the reasons for its sentencing decisions. The court stated that it had reviewed the probation report and material submitted by the defense in support of its request for imposition of probation.[10] The court said it "spent a considerable amount of time evaluating the resentencing

---

[10] The probation report used at Delgado's resentencing was the same one that had been filed previously for her original sentencing and recommended that Delgado be placed on probation for three years with conditions.

21

requests that were made by the attorneys and also reconsidered the recommendation that was made by probation." In concluding that probation was not appropriate, the court noted that Delgado's criminal conduct "was extremely aggressive and threatening" and had included entering Rafael C.'s and Brenda C.'s apartment and making threats to kill their entire family. In the court's view, Delgado also "attempted to misinform the 911 dispatcher about the circumstances surrounding the offense by portraying herself in a light that was contrary to her actions." Regarding the impact of Delgado's crimes on the victims, the court noted the "emotional injury" and "long-lasting fear" they had of gang-related retaliation. Furthermore, in selecting the low term for each of Delgado's convictions, the court considered that Delgado had "an insignificant record of criminal conduct" and her prior performance on probation had been "satisfactory."

When specifically addressing Delgado's request to strike the violent felony allegation, the court referenced its reasons for declining to grant probation and further highlighted Delgado's entry into the apartment, her concerns about the care of her children while incarcerated, and the "egregious circumstances" of her crimes. Based on the record of Delgado's sentencing hearing and the trial evidence, we conclude there is ample support for the trial court's refusal to strike the violent felony allegation.

In addition, we are not persuaded by Delgado that, under *Vargas*, *supra*, 59 Cal.4th 635, the trial court "was obligated to strike the 'person present' violent felony allegation." Setting aside the fact that Delgado did not mention *Vargas* when she made her request to strike in the trial court, *Vargas* does not bolster Delgado's assertion that "no reasonable trial judge could have declined to exercise the court's section 1385 discretion to vacate this enhancement provision on the facts of the present case."

In *Vargas*, the California Supreme Court examined "whether the trial court should have dismissed one of defendant's two prior felony convictions, alleged as strikes under the Three Strikes law, where both convictions were based on the same act." (*Vargas*, *supra*, 59 Cal.4th 635 at p. 640.) The court noted that the defendant had been convicted

22

"of two different crimes (robbery and carjacking) that were based on her commission of the same act (forcibly taking the victim's car)." (*Id*. at p. 645.) Further, the court explained that the Three Strikes law intended that "no one can be called for two strikes on just one swing." (*Id*. at p. 646.) Our high court concluded that "the trial court was required to dismiss one of defendant's two prior strike convictions," because a failure to do so under the circumstances "was inconsistent with the intent underlying both the legislative and initiative versions of the Three Strikes law." (*Id*. at p. 645.) *Vargas* did not address section 2933.1 or section 667.5(c)(21).

We are not convinced that *Vargas*'s conclusion regarding the intent of the Three Strikes law dictates a particular outcome in Delgado's case. By contrast to the present case (and as discussed *ante*), the plain meaning of section 2933.1 suggests a purpose to incarcerate persons convicted of a violent offense in a single prosecution for a longer period regardless whether their criminal conduct overlaps to satisfy the elements of the underlying crime of conviction and the violent felony allegation. Additionally, unlike the single-victim situation at issue in *Vargas*, the violent felony allegation in the present case extended not only to Brenda C. but also to the six children inside the apartment. Thus, *Vargas* is inapposite to Delgado's sentencing.

Under the circumstances of this case, the trial court acted within " 'the bounds of reason' under the applicable law and the relevant facts" (*Williams*, *supra*, 17 Cal.4th at p. 162) when it refused to strike the violent felony allegation under section 1385. Accordingly, we conclude the trial court did not abuse its discretion.

C. *Sufficiency of the Evidence for Dissuasion Conviction on Count 2*

At trial, Delgado was found guilty on count 2 for dissuading Rafael C., in violation of section 136.1, subdivision (c)(1). On appeal, Delgado contends there is insufficient evidence for that conviction.

23

1. <u>Legal Principles</u>

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319; *People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.) "In applying this test, we . . . presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Ibid*.) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid*.)

Section 136.1, subdivision (c)(1) provides that every person who knowingly and maliciously commits an act described in subdivision (a) or (b), where the act is accompanied by force or by an express or implied threat of force or violence, is guilty of a felony.[11] Based on the information and jury instructions for count 2, the relevant act under section 136.1, subdivision (c)(1) in this case is that described by subdivision (b)(1). Section 136.1, subdivision (b)(1) provides, in pertinent part: "[E]very person who attempts to prevent or dissuade another person who has been the victim of a crime or who

---

[11] Section 136.1, subdivision (c) states, in relevant part: "Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances: [¶] (1) Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person." (§ 136.1, subd. (c).)

is witness to a crime from doing any of the following is guilty of a public offense . . .: [¶] (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge." (§ 136.1, subd. (b)(1); see also *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347.)

Further, the jury instructions here stated "the People must prove that: [¶] 1. The defendant maliciously tried to prevent or discourage Rafael [C.] from making a report that he was a victim of a crime to local law enforcement; [¶] 2. Rafael [C.] was a crime victim; [¶] AND [¶] 3. The defendant knew she was trying to prevent or discourage Rafael [C.] from making a report that he was a victim of a crime to local law enforcement and intended to do so." As for who is a victim, the instruction read: "A person is a *victim* if there is reason to believe that a federal or state crime is being or has been committed or attempted against him or her." (See CALCRIM No. 2622; § 136.1, subd. (c).)

### 2. Analysis

Delgado contends "there simply is no evidence that what [Rafael C.] was doing [when speaking to law enforcement] was 'making a report that he was a victim of a crime. . . .' The nature of his report to law enforcement was that there were kids who were improperly in the pool area . . . [and] their presence in the pool area was not a crime." More specifically, Delgado asserts that people who were in the pool area had not committed criminal trespass under section 602, and there is no evidence "that the threats by [Delgado] were directed at dissuading [Rafael C.] from reporting anything other than the youths' entry into the pool area – which was why he called 9-1-1, as he plainly and repeatedly explained to the dispatcher."

For reasons we explain, Delgado's claim fails because, regardless whether the people in the pool area were trespassing in violation of the Penal Code, there is sufficient evidence supporting a finding that Delgado knowingly and maliciously tried to prevent or

25

discourage Rafael C. from reporting a crime Delgado committed against him. Rafael C. testified that he called the police after a man confronted him and said, " 'I'm going to fuck you up.' " Rafael C. initially told the 911 dispatcher that he wanted to report people in the closed pool. A short time later, Delgado arrived, and Rafael C. told her he was talking to the police—confirming what Delgado had already learned from her daughter. Delgado then threatened Rafael C. by saying, " 'Oh, well, we're Norteños, then. We're going to fuck you.' "

As Rafael C. continued speaking to the 911 dispatcher, Delgado threatened to kill Rafael C.'s entire family and told him that he should stop calling the police. Rafael C. also heard Delgado say to Brenda C. that if she did not tell Rafael C. to stop calling the police, Delgado would kill her and the children. Additionally, Rafael C. reported to the dispatcher that Delgado said she wanted to kill him and immediately provided his address to the dispatcher. Delgado responded by saying, "Think's [*sic*] he can scare us. He'll fucking scare us." Soon after, Delgado took Rafael C.'s cell phone from him, telling the dispatcher that she did so because he "doesn't need to be doin' this." When she returned the phone, Delgado told Rafael C. to talk to the police and said, " 'You'll see, I'm going to fuck you.' "

The jurors could reasonably infer from this evidence that Delgado not only tried to stop Rafael C. from talking to the 911 dispatcher about what had occurred before she arrived at the pool area, but also that she tried to stop Rafael C. from reporting the threats she had made toward him. (See *People v. McElroy* (2005) 126 Cal.App.4th 874, 881–883.) Viewing the trial evidence in the light most favorable to the guilty verdict on count 2, we conclude there is sufficient evidence from which a reasonable juror could find beyond a reasonable doubt that Delgado knowingly and maliciously, using force or threats of force or violence, tried to prevent or dissuade Rafael C. from reporting his victimization.

D.  *Section 654 and the Sentence on Count 3*

In the alternative to her claim that the evidence of dissuasion on count 2 is insufficient, Delgado contends the concurrent sentence imposed on count 3 for her criminal threats against Rafael C. must be stayed under section 654.

### 1.  Legal Principles

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct."  (*People v. Assad* (2010) 189 Cal.App.4th 187, 200 (*Assad*).)  Even concurrent sentences on convictions subject to section 654 are prohibited; the sentence on one of the two applicable convictions must be imposed and then stayed.  (*People v. Deloza* (1998) 18 Cal.4th 585, 591–592.)

Application of section 654 "requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*Corpening*, *supra*, 2 Cal.5th at p. 311.)  Only if the case involves more than one act does a court consider whether the case involves a course of conduct.  (*Ibid*.)  "At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act."  (*Id*. at p. 312.)  "Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses."  (*Id*. at p. 313.)  If the convictions involve more than one act, the court reaches "step two of the section 654 analysis:  whether the [course of conduct] involved multiple intents and objectives."  (*Id*. at p. 316.)

At step two, whether crimes arise from an indivisible course of conduct turns on the perpetrator's intent and objective.  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."  (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled in part on another ground in *Correa*, *supra*, 54 Cal.4th at

27

p. 341.) "Moreover, where a course of conduct is divisible in time it may give rise to multiple punishment even if the acts are directive to one objective." (*People v. Louie* (2012) 203 Cal.App.4th 388, 399 (*Louie*).) "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) Whether a defendant harbored a single intent—and thus a single objective—is a factual question; the applicability of section 654 to settled facts is a question of law. (*Harrison*, at p. 335.) We review the record for substantial evidence to support implied findings sufficient to uphold the sentence under section 654. (See *People v. Osband* (1996) 13 Cal.4th 622, 730–731.)

 2.  Analysis

Delgado maintains that "the witness dissuasion and criminal threats uttered" by her with respect to Rafael C. "were part and parcel of a single continuous act and course of conduct, and cannot be twice punished."[12]

We are not persuaded that the convictions on counts 2 and 3 are based on a single physical act or that they comprise an indivisible course of conduct that Delgado committed with a single intent and objective. The evidence here demonstrates that Delgado tried to dissuade Rafael C. not only by repeatedly threatening violence on him and his family, but by grabbing his cell phone out of his hand and running away with it. Delgado thus committed a forceful physical act in trying to prevent or discourage Rafael C. from making a report to law enforcement that was distinct from her verbal threats to kill Rafael C. and his family.

---

[12] Although Delgado did not object under section 654 at her resentencing, the "failure . . . to object on this basis in the trial court does not forfeit the issue." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.) Further, if a trial court erroneously fails to stay the execution of a sentence pursuant to section 654, the trial court has acted in excess of its jurisdiction, and a reviewing court must correct the error on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.)

Furthermore, there is substantial evidence supporting a finding that Delgado harbored more than one purpose when she orally threatened Rafael C. and did so in a temporally separated manner over the course of the incident. Delgado initially threatened Rafael C. after witnessing him talking to a 911 dispatcher about the group's use of the pool. Subsequently, Delgado uttered murderous threats about Rafael C.'s entire family and made statements urging him to stop talking to law enforcement. Additionally, Delgado spent time inside the apartment threatening Brenda C. and talking calmly to the 911 dispatcher, before she ultimately gave Rafael C. his phone back and said, " 'You'll see, I'm going to fuck you.' " This evidence supports that Delgado's criminal threats and dissuasion of Rafael C. occurred under circumstances that allowed her to reflect on and renew her intent and involved more than one objective because her threats and dissuasion happened successively and under changing circumstances as the incident progressed.

Delgado's reliance on *People v. Mendoza* (1997) 59 Cal.App.4th 1333 and *Louie*, *supra*, 203 Cal.App.4th 388 as support for her claim of section 654 error is misplaced. In both those cases there was a single criminal threat involving an objective of dissuading a witness. (See *Mendoza*, at pp. 1345–1346; *Louie*, at p. 399.) Here, there were multiple threats over the course of the incident.

Additionally, we are not persuaded by Delgado that, because section 136.1 was charged as a single crime and has been construed as falling within the "continuous conduct exception" for which "no election or unanimity instruction was required" (*People v. Salvato* (1991) 234 Cal.App.3d 872, 883), it is "untenable" to examine Delgado's actions throughout the incident to determine if she harbored more than one purpose under section 654. "The flaw in this argument is that the application of section 654 does not depend on the *allegations* of the charging instrument, but on what was *proven* at trial." (*Assad*, *supra*, 189 Cal.App.4th at p. 200.) In this case, the trial court instructed the jurors that to find Delgado guilty on counts 2 and 3, they had to unanimously agree on an act that proved she committed the offense. Further, the court

29

instructed the jurors that each count is a separate crime that must be considered separately and result in separate verdicts. Under the circumstances of this case, the jurors could have convicted Delgado on counts 2 and 3 based on different acts. Moreover, the goal of section 654 is to ensure that the punishment is commensurate with the defendant's culpability. (*Correa*, *supra*, 54 Cal.4th at p. 341.) In this context, the multiple acts committed with opportunity for reflection and for different purposes render Delgado more culpable and permit multiple punishment.

For these reasons, we conclude that the trial court properly imposed unstayed concurrent sentences under section 654 on counts 2 and 3.

### III. DISPOSITION

The judgment is affirmed.

_____
                              Danner, J.


WE CONCUR:




_____
Greenwood, P.J.




_____
Wilson, J.




**H047799, H048217**
*People v. Delgado*